# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

PAUL P. LEVASSEUR,

      Plaintiff,

vs.

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

**No. 05-CV-4056**

**ORDER**

_____

This case involves an application for supplemental security income benefits (SSI) based on disability under Title XVI of the Act, 42 U.S.C. §§1381 et seq. Plaintiff, Paul Levasseur, (hereinafter "Levasseur"), filed this action requesting reversal of the Commissioner's decision that he is not disabled. After careful consideration of the parties' written and oral arguments, the Court reverses the decision of the Administrative Law Judge ("ALJ") and awards benefits as of February 12, 2003.

## I.  INTRODUCTION

Paul Levasseur ("Levasseur") applied for supplemental security income benefits (SSI) based on disability under Title XVI of the Act, 42 U.S.C. §§1381 et seq. Tr. 130-32. Levasseur's alleged disability onset date is December 1, 1999. Tr. 130.

Levasseur's application was denied initially and on reconsideration. Tr. 112-15, 119-22. A hearing was held before an ALJ on May 20, 2004. The ALJ determined that Levasseur was not "disabled" within the meaning of the Social Security Act. Tr. 26. The Appeals Council denied request for review, therefore, the ALJ's decision stands as the final decision of the Commissioner.

## II. **BACKGROUND**

Levasseur was 54 years old at the time of the administrative hearing. He has a high-school education and has worked as a painter and a foreman. Levasseur alleges disability based on the following impairments: thyroid disease, back pain, depression, anxiety attacks, panic attacks, and three surgeries on his right hand. Tr. 218.

Levasseur testified that he worked as a painter/foreman for twenty-seven (27) years, and then worked on his own until he began having health problems. Tr. 44. Plaintiff was diagnosed with hyperthyroid and received radioactive iodine to remove the thyroid gland on June 26, 2001. Tr. 356.

On August 2, 2001, Levasseur was admitted to a hospital with atrial fibrillation[1]. During this hospitalization,

---

[1] An irregular, often rapid ventricular rate. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 695 (30th ed. 2003).

Levasseur tested positive for methamphetamines, cannabinoids, and cocaine. Tr. 270, 277.

On September 20, 2001, Levasseur went to the emergency department for complaints of feeling anxious, wanting to hurt people, and recent complaints of headaches with blurred vision along with low back pain. While hospitalized, psychiatrist, Dr. Philip Muller saw Levasseur for problems related to panic and anxiety. Tr. 290-91. Dr. Muller diagnosed Levasseur with adjustment disorder with mixed features, marijuana abuse, hypothyroidism, back problems and headaches, and a Global Assessment of Functioning ("GAF")[2] score of 55. Dr. Cassandra Garcia also saw Levasseur during this hospitalization. Dr. Garcia noted that Levasseur has not been able to work because of low back discomfort, which likely resulted from a fall a few weeks ago. Tr. 299. Levasseur testified that he broke his back and three ribs and damaged his seventh and eighth lumbar. Tr. 45.

Levasseur continued to see his treating physician, Dr. Gary Hattan, for hypothyroidism, chronic back pain, and panic

---

[2] GAF score is used by psychologists and psychiatrists to measure a person's functioning at the time of the session.

attacks. Tr. 326-342. On November 20, 2001, Dr. Hattan noted that Levasseur has "[c]hronic low back pain without neurologic deficit, likely musculoskeletal in nature." Tr. 324.

On January 18, 2002, Levasseur met with Dorothy Westin, a social worker. Tr. 398-400. Ms. Westin diagnosed Levasseur with "Major Depressive Disorder" and assessed him a GAF score of 42[3]. Tr. 400. Levasseur has a lengthy history of not showing up for treatment or scheduled appointments. See egs. 401-04, 427-30, 436, 439-42, 477, 551-53, 562, 564, 574-78. However, Levasseur testified that his lack of insurance prohibited him from seeking the necessary help, Tr. 51, and Levasseur did not have a driving license, which resulted in difficulty with transportation. Tr. 564.

On February 12, 2003, Dr. Clayton Van Balen performed a consultative exam on Levasseur. Tr. 443-47. Levasseur indicated that he is disabled due to anxiety/depression, thyroid disorder, and back problems. Tr. 443. Dr. Van Balen indicated that repeated bending and twisting bothers Levasseur. Id. After the examination, Dr. Van Balen

---

[3] The DSM-IV-TR, the diagnostic Bible of mental disorders, indicates that a GAF score between 41-50 the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g., no friends, inability to keep a job)." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000).

diagnosed Levasseur with panic attacks and depression; status-post laceration right hand with limitation of flexion of right fifth finger and associated paresthesia; right inguinal hernia; obesity; and chest pain. Tr. 444. Dr. Van Balen also determined that Levasseur could not lift or carry more than 20 pounds; walk more than one block without the ability to rest; no standing or sitting limitations; no climbing/crawling or repetitive stooping or kneeling. Tr. 445.

On May 13, 2003, Dr. Hattan agreed with Levasseur in concluding that "[Levasseur] cannot function well enough to work." Tr. 511. However, Dr. Hattan noted that there has been a history of drug abuse and treatment non-compliance, which has made it difficult to get Levasseur to work again. Id.

On April 24, 2004, a psychiatric evaluation was done on Levasseur by Dawn Nolan, a physician's assistant. Tr. 547-48. Ms. Nolan diagnosed Levasseur with panic disorder with agoraphobia[4], hypothyroidism, chronic back pain, and assessed him a GAF score of 50[5]. Tr. 548.

---

[4] "[I]ntense, irrational fear of open spaces, characterized by marked fear of being alone..." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 40 (30th ed. 2003).

[5] See supra note 3.

By May 6, 2004, Dr. Robert Spanheimer indicated that Levasseur was receiving adequate thyroid hormone and that he believed Levasseur was compliant with the recommended dosage of medication.  Tr. 592.

## III.    **ADMINISTRATIVE LAW HEARING**

Levasseur testified that when he first started noticing problems with regards to his thyroid, his heartbeat was beating five times faster than what it was supposed to be, which caused weight loss and mental problems.  Tr. 44. Levasseur stated that he took a radioactive pill to remove the thyroid gland and has never been the same since.  <u>Id</u>.  For example, Levasseur stated that "it's hard to breathe" and he has "heart palpitations."  Tr. 46.

Levasseur also stated that several years ago, he fell on some ice and broke his back and three ribs.  Tr. 45. Levasseur testified that his back has continuously gotten worse and has since affected his hips.  <u>Id</u>.  As a result of this, Levasseur stated that he can only stand for five minutes before his back starts aching and after ten minutes he must lay down.  <u>Id</u>.

Levasseur testified that he has had two surgeries on his right hand, i.e., his painting hand, and he cannot grip

anything with it.  Tr. 46.  Levasseur also stated that for the past four to four and a half years, he has suffered from panic/anxiety attacks, which result in depression.  Tr. 47. This is supported by his trip to the emergency room due to panic attacks, Tr. 290-91, and his continuous treatment with his treating physician Dr. Hattan.  Levasseur explained that these panic/anxiety attacks are usually caused by being around children or women or anything that upsets him.  Id.  Levasseur testified that these attacks occur anywhere from daily to once a week depending on the situation he is in.  Id.  Levasseur stated that he takes Xanax[6] three times a day for these attacks and an additional one or two during an attack.  Tr. 48.

Levasseur testified that he can walk about a half of a block before his back starts bothering him.  Tr. 51.

Levasseur stated that his back starts hurting right away from standing; starts aching real bad after bending for about five minutes; starts hurting from lifting things.  Tr. 52. Levasseur stated that after about five minutes of standing, he has pain in his lower back, which shoots across the whole back

---

[6]  An antianxiety agent used in the treatment of anxiety disorders and panic disorders and for short-term relief of anxiety symptoms.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 2068, 54 (30th ed. 2003).

horizontally and his hip begins hurting.  Tr. 62.  Levasseur indicated that sitting for him "is not too bad", but the best position for him is laying down.  Tr 62-63.

Levasseur also stated that his vision gets blurry and he gets dizzy from bending over.  Tr. 63.  Levasseur testified that when he gets stressed he starts breathing heavy, sweating profusely, vision becomes blurred, and becomes angered.  Tr. 65-66.  Levasseur testified that he could lift about twenty pounds and he is very sensitive to cold weather.  Tr. 66.

Next, Levasseur's son, Charles, testified.  Tr. 68.  Charles testified that at times Levasseur is "unstable" and will break out in sweats, gets nervous, paces, and "goes into a panic attack."  Tr. 69-70.  Charles stated that he can notice when Levasseur is about to go into a panic attack and he will attempt to remove Levasseur from the situation to try and calm him down.  Tr. 70.  In Charles' opinion, Levasseur could not work again because Charles has worked with his dad since he was a kid and now his dad will start profusely sweating and have to sit down after working for awhile.  Tr. 71.

Lastly, the vocational expert ("VE"), Elizabeth Albrick, testified.  Tr. 71.  The ALJ's first hypothetical question

posed to the VE asked if the following individual can perform any jobs he has previously performed personally or how the jobs are "generally performed within the national economy" if the:

> individual...is 54 years old, he's a male
> and he has a high school education. He has
> also completed an apprenticeship in
> painting and he has past relevant work as
> you've indicated in Exhibit 22E and he has
> the following impairments. He has
> hypothyroidism, hypertension, obesity, a
> history of atrial fibrillation, gastro-
> esophageal reflux disease, he has status-
> post laceration of the right hand,
> medically determinable impairments
> resulting in complaints of back pain and
> shortness of breath. He has status-post
> inguinal hernia repair. He has a history
> of carpal tunnel syndrome. History of
> panic disorder with agoraphobia, dysthymia
> and chronic substance abuse and, as a
> result of a combination of those
> impairments and medication or treatment
> prescribed for those impairments, he has
> the residual functional capacity as
> follows: He cannot lift more than 20
> pounds, routinely lift 10 pounds, with no
> continuous bending, stooping, squatting,
> kneeling, crawling or climbing. This
> individual should not work at unprotected
> heights or around hazardous, moving
> machinery. He should not be exposed to
> excessive cold. He is not able to do very
> complex or technical work but is able to do
> more than simple, routine, repetitive work
> that does not require constant, very close
> attention to detail. He can have only
> occasional contact with the public and he
> does require occasional supervision. He
> should not work at more than a regular pace

> and that's using three speeds of pace,
> being fast, regular, and slow and he should
> not work at more than a moderate level of
> stress.

Tr. 74-75. The VE determined that the lifting of 20 pounds occasionally and 10 pounds frequently would preclude this individual from performing his past jobs, which are classified as "medium jobs." Tr. 75-76.

However, the VE testified that the skills acquired from the previous jobs would be transferable and allow the individual to perform other jobs given the hypothetical's limitations. Tr. 76. The VE determined that the individual could perform jobs such as: repair order clerk, maintenance dispatcher, or service clerk. Id.

Next, the ALJ asked the VE a second hypothetical question, which included the same age, sex, education, past relevant work and impairments as the previous hypothetical question, but the residual functional capacity would be:

> could not lift more than 20 pounds,
> routinely lift 10 pounds, no standing of
> more than five minutes at a time, no
> sitting of more than a half hour at a time,
> no walking of more than one-half to one
> block at a time, with only occasional
> bending, stooping, squatting, only
> occasional pushing or pulling, no work
> requiring continuous gripping with the
> right hand, only occasional work with the
> arms overhead. This individual should not

10

be exposed to excessive heat, humidity or
cold...only occasional contact with the
public, coworkers and/or supervisors,
however he does require occasional
supervision...

Tr. 77. The VE determined that this individual could not

perform any past work or have any transferrable skills to

perform other jobs, skilled or unskilled, due to the standing

of only five minutes at a time and sitting only 30 minutes at

a time limitation. Tr. 77.

## IV. ALJ'S DECISION

The ALJ concluded that Levasseur has not engaged in

substantial gainful activity since at least December 1, 1999,

which is his alleged disability onset date. Tr. 25. Next,

the ALJ determined that Levasseur had the following "severe"

impairments:

history of hypothyroidism, status post
ablative therapy; history of hypertension;
obesity; history of atrial fibrillation;
gastroesophageal reflux disease; history of
right inguinal hernia, status post repair
of right inguinal hernia; history of back
pain and shortness of breath; status post
two carpal tunnel releases on the right
dominant hand, status post laceration of
right hand, by history; history of chronic
substance abuse, in alleged remission;
dysthymia; and history of a panic disorder
with agoraphobia.

Tr. 25-26. But, the ALJ concluded that these impairments or

a combination of these impairments did not meet or equal the level of severity required under the social security listings to allow benefits for plaintiff. Tr. 26.

The ALJ determined that Levasseur and his son were not credible in their testimony at the administrative hearing. Id. The ALJ concluded that Levasseur could not perform his past relevant work, but possessed the residual functional capacity to perform the exertional requirements of light work activity. The ALJ concluded that based on the claimant's age, education, previous work experience, and residual functional capacity that there were significant jobs in the national economy that Levasseur could perform. They are: repair order clerk, maintenance, dispatcher, or service clerk. Id. Based on the foregoing, the ALJ concluded that Levasseur was not disabled.

## V. DISCUSSION

This Court must determine whether the Commissioner's decision to deny disability benefits is "supported by substantial evidence on the record as a whole." Lorenzen v. Chater, 71 F.3d 316, 318 (8th Cir.1995).

### A. THE COURT'S JURISDICTIONAL BASIS

In Bowen v. Yuckert, 482 U.S. 137 (1987), the United

States Supreme Court delineated the steps which precede a district court's review of a Social Security appeal:

> The initial disability determination is made by a state agency acting under the authority and supervision of the Secretary. 42 U.S.C. § 421(a), 1383b(a); 20 C.F.R. §§ 404.1503, 416.903 (1986). If the state agency denies the disability claim, the claimant may pursue a three-stage administrative review process. First, the determination is reconsidered de novo by the state agency. 20 C.F.R. §§ 404.909(a), 416.1409(a). Second, the claimant is entitled to a hearing before an administrative law judge (ALJ) within the Bureau of Hearings and Appeals of the Social Security Administration. 42 U.S.C. §§ 405(b)(1), 1383(c)(1) (1982 ed. and Supp. III); 20 C.F.R. §§ 404.929, 416.1429, 422.201 et seq. (1986). Third, the claimant may seek review by the Appeals Council. 20 C.F.R. §§ 404.967 et seq., 416.1467 et seq. (1986). Once the claimant has exhausted these administrative remedies, he may seek review in federal district court. 42 U.S.C. §405(g).

Yuckert, 482 U.S. 137, 142, 107 S. Ct. 2287, 2291 96 L. Ed. 2d 119 (1987).

Section 1383(c)(3) of Title 42 of the United States Code provides, "The final determination of the Secretary after a hearing . . . shall be subject to judicial review as provided in section 405(g) of this title. . . ."  In pertinent part, 42 U.S.C. § 405(g) provides:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action . . .brought in the district court of the United States for the judicial district in which the plaintiff resides... The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . . The judgment of the court shall be final except that it shall be subject to review in the same manner as a judgment in other civil actions . . . .

Accordingly, this Court may affirm, reverse or remand the ALJ's decision.

## B.   THE SUBSTANTIAL EVIDENCE STANDARD

The Eighth Circuit has made clear its standard of review in Social Security cases.   If supported by substantial evidence in the record as a whole, the Secretary's findings

are conclusive and must be affirmed. <u>Grissom v. Barnhart</u>, 416 F.3d 834, 837 (8th Cir. 2005); <u>Smith v. Shalala</u>, 31 F.3d 715, 717 (8th Cir. 1994) (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); 42 U.S.C. § 405(g) (Supp. 1995)). "Substantial evidence 'is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.'" <u>Maresh v. Barnhart</u>, 438 F.3d 897, 898 (8th Cir. 2006) (quoting <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000)). In the words of the Supreme Court, substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (citing <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).

The Eighth Circuit has taken pains to emphasize that, "[a] notable difference exists between 'substantial evidence' and 'substantial evidence on the record as a whole.'" <u>Wilson v. Sullivan</u>, 886 F.2d 172, 175 (8th Cir. 1989) (quoting <u>Jackson v. Bowen</u>, 873 F.2d 1111, 1113 (8th Cir. 1989)).

> "Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis. In the review

> of an administrative decision, "[t]he
> substantiality of evidence must take into
> account whatever in the record fairly
> detracts from its weight." Thus, the court
> must also take into consideration the
> weight of the evidence in the record and
> apply a balancing test to evidence which is
> contradictory.

Id.

The Court, however, does "'not re-weigh the evidence or review the factual record de novo.'" Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996) (quoting Naber v. Shalala, 22 F.3d 186, 188 (8th Cir. 1994)). Likewise, it is not this Court's task to review the evidence and make an independent decision. Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996) (citing Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996)). "If, after review, [it is] possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [this Court] must affirm the denial of benefits." Id. Even in the case where this Court "might have decided the case differently", this Court cannot reverse if there is substantial evidence to support the Commissioner's decision. Fredrickson v. Barnhart, 359 F.3d 972, 976 (8th Cir. 2004) (citing Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002)).

The process, however, is not stacked in the

Commissioner's favor because, "[t]he standard requires a scrutinizing analysis, not merely a 'rubber stamp' of the [Commissioner]'s action." <u>Cooper v. Secretary</u>, 919 F.2d 1317, 1320 (8th Cir. 1990) (citing <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989)). In cases where the Commissioner's position is not supported by substantial evidence in the record as a whole, the Court must reverse. <u>See Lannie v. Shalala</u>, 51 F.3d 160, 164 (8th Cir. 1995). "'[T]he goals of the Secretary and the advocates should be the same: that deserving claimants who apply for benefits receive justice.'" <u>Battles v. Shalala</u>, 36 F.3d 43, 44 (8th Cir. 1994) (quoting <u>Sears v. Bowen</u>, 840 F.2d 394, 402 (7th Cir. 1988)).

### C. DETERMINATION OF DISABILITY

Social Security Disability Benefits may be awarded to disabled individuals who meet certain income and resource guidelines. 42 U.S.C.A. § 423 (d)(1)(A). In connection with the award of such benefits to an adult:

> [A]n individual shall be considered to be disabled . . . if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C.A. § 423 (d)(1)(A).

An impairment will only be considered of such severity if the individual is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful activity which exists in the national economy. . . ."  42 U.S.C.A. § 423 (d)(2)(A).

Determination of a claimant's disability involves a five step analysis.  20 C.F.R. § 404.1520 (a-f).  In the first step, the ALJ determines if the Claimant had engaged in past substantial gainful activity.  Next, the ALJ decides if the Claimant has an impairment.  Third, the ALJ must look at the regulations to determine if the impairment meets or is medically or functionally equal to a Listing in Appendix 1, Subpart P of Regulation No. 4.  Fourth, the ALJ assesses the Claimant's residual functional capacity (RFC), to see if the Claimant could perform his past relevant work.  At the fifth and final step of the analysis, the Social Security Commission must prove that there are a significant number of jobs (other than his past relevant work) in the national economy that a person of the same age, education, past work experience, and physical and mental residual functional capacity can perform. 20 C.F.R. § 404.1520 (f).

To acquire Social Security disability benefits, initially the claimant has the burden of showing 'that [he] is unable to perform [his] past relevant work.'" Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (quoting Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998)). This encompasses the first four steps of the analysis. "If the claimant carries [his] burden, 'the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and with vocational factors such as age, education, and work experience.'" Id. There must be some medical evidence to support the ALJ's determination of the claimant's residual functional capacity and this evidence should address the claimant's ability to function in the workplace. Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam); Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

D.   **REVIEW OF THE ALJ'S DECISION**

"Deference to the ALJ's credibility determination is warranted if the determination is supported by good reasons and substantial evidence." Tellez v. Barnhart, 403 F.3d 953,

957 (8th Cir. 2005). By that same token, the ALJ's credibility determination should not just be stated as a conclusion in the guise of findings, but should be closely and affirmatively linked to substantial evidence. Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).

Additionally, the law in the Eighth Circuit is well settled that an ALJ may not discredit a claimant's subjective complaints of pain, discomfort, or other disabling limitations simply because there is a *lack of objective evidence*. See Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002) (noting that the ALJ may not discredit a claimant solely because the objective medical evidence does not fully support the claimant's subjective complaints of pain). Instead, the ALJ may only discredit the subjective complaints if they are inconsistent with the record as a whole. See Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003); see also Bishop v. Sullivan, 900 F.2d 1259, 1262 (8th Cir. 1990) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).

Under Polaski, the ALJ must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining

physicians relating to: 1) the claimant's daily activities; 2) the duration, frequency and intensity of the pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5) functional restrictions. Polaski, 739 F.2d at 1322. When the ALJ considers all of the Polaski factors and still makes a determination to reject a claimant's subjective complaints, the ALJ must give "good reasons" for discrediting the claimant's testimony. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). If an ALJ discredits a claimant's testimony and gives good reasons for doing so, the ALJ's decision should normally receive deferential treatment. Id. (quoting Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990)).

In this case, it is undisputed that Levasseur carried his burden of proving that he is unable to perform his past relevant work. However, the dispute is over whether or not the Commissioner carried her burden of proving that Levasseur retains the physical residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with Levasseur's impairments and with vocational factors such as age, education, and work experience.

The ALJ concluded that Levasseur's and his son's testimony were not credible. Tr. 24. First, in assessing Levasseur's subjective complaints, the ALJ must consider Levasseur's work record. Although the ALJ gives Levasseur some credit for his work record, the ALJ glosses over the fact that Levasseur had more than "a pretty stable work history." Tr. 20. Levasseur has a solid-consistent work history for twenty-seven (27) years before his earnings start to disappear due to his alleged impairments.

Levasseur's strong work history for twenty-seven (27) years supports his credibility as it relates to his subjective complaints. In this Court's experience, every time a claimant has a "poor" work history, the ALJ and the Commissioner rely heavily on this factor in discrediting a claimant. Although this is only one factor for this Court to consider in assessing credibility, this Court is persuaded that a person with that kind of work history should not have his truth or veracity (here it's called "credibility") questioned on the record now before this Court. This Court is persuaded that Levasseur's strong work history supports his allegations of disability.

Secondly, the ALJ must consider observations by third

parties. Levasseur's son testified at the hearing and indicated that he has been working with Levasseur since he was a kid. Tr. 71. Levasseur's son indicated that his dad just is not the same anymore. The son stated, "He gets real nervous, starts pacing back and forth, has to lay down for awhile. Like I say, he just goes into a panic attack." Id. This is not really an "opinion" that he can puff up to help his father. If you follow the words precisely, it has nothing to do with an "opinion"; it's a graphic statement of what he actually saw.

This Court has reviewed the ALJ's decision and does not find that the ALJ made any specific credibility findings as to the testimony of plaintiff or his son. The ALJ is supposed to make specific credibility determinations or articulate reasons for discrediting the testimony by providing specific inconsistencies and discuss the Polaski factors when reaching credibility findings. See Baker v. Apfel, 159 F.3d 1140, 1144 (8th Cir. 1998); Tang v. Apfel, 205 F.3d 1084, 1087 (8th Cir. 2000).

Levasseur's brother also stated that Levasseur "has trouble completing tasks[,] [h]e gets short of breath, shaky, winded, [and] anxious." Tr. 511. Levasseur's brother

believes that Levasseur would not function very well in the job market.  Id.

This Court is persuaded that the ALJ did not sufficiently consider the third party witnesses' observations.  Although both these witnesses are relatives of the plaintiff, they have a close and lengthy relationship with Levasseur and understand, probably more than anyone, the changes that Levasseur has went through over the past several years. Levasseur's subjective complaints are supported by the observations of these third parties.

Lastly, the ALJ must consider observations by treating and examining physicians.  The ALJ implied that a lot of Levasseur's problems could potentially be alleviated if Levasseur would comply with treatment.  Levasseur has a lengthy history of panic attacks, with or without medications. See egs. Tr. 261, 293, 481.  On one occasion, Levasseur was brought to the hospital by his son during an "anxiety reaction" while Levasseur reported that he was taking his medication.  Tr. 293.

This Court is aware that the record contains several instances in which Levasseur missed appointments or quit taking certain medications relating to his thyroid.  However,

the ALJ failed to inquire as to why Levasseur missed his appointments or quit taking some of the medications periodically. There are several reasons why a person may cease taking certain medications, e.g. side effects, and several reasons as to why a person may not go to doctor. In fact, Levasseur testified that he has been removed from the hospital for lack of insurance and has missed appointments due to lack of a driver's license, a vehicle, or a ride to the scheduled appointment. This Court is persuaded that the ALJ relied too heavily on the fact that Levasseur missed scheduled appointments in discrediting Levasseur's subjective complaints.

The record is replete with instances in which Levasseur was hospitalized due to panic/anxiety attacks while on medication. Levasseur testified that these attacks occur anywhere from daily to weekly depending on the situation. Tr. 47. Levasseur's son and brother stated that Levasseur can no longer work due to these attacks.

Levasseur's treating physician, Dr. Gary Hattan, indicated that he believes that Levasseur cannot work. Tr. 511. Furthermore, a consultative examine was performed by Dr. Clayton Van Balen. Tr. 443-45. Dr. Van Balen diagnosed

Levasseur with panic attacks and depression; status-post laceration right hand with limitation of flexion of right fifth finger and associated paresthesia; right inguinal hernia; obesity; and chest pain. Tr. 444. Dr. Van Balen also determined that Levasseur could not lift or carry more than 20 pounds; walking more than one block without the ability to rest; no standing or sitting limitations; no climbing/crawling or repetitive stooping or kneeling. Tr. 445.

However, the ALJ did not give the proper weight to the opinion of Levasseur's treating physician or use the consultative physician's entire opinion, but relies instead on the assessment of a non-examining physician's limitations of Levasseur, i.e., Dr. Lawrence Staples. Tr. 456. "[A]s a general rule, reports of non-examining physicians deserve little weight in the overall evaluation of disability, especially in light of evidence to the contrary." Davis v. Schweiker, 671 F.2d 1187, 1189 (8th Cir. 1982). This Court is persuaded that the non-examining physician's report is full of inconsistencies as to the record. For example, the non-examining physician indicated that there is no objective evidence to support that Levasseur is limited to lifting and carrying more than 20 pounds. However, the record is full of

26

doctors' opinions and objective medical evidence that Levasseur suffers from back problems. Therefore, a natural conclusion would be that Levasseur would be restricted in his lifting and carrying capabilities to prevent further back problems as demonstrated by Dr. Van Balen's conclusions on Tr. 445.

Although Levasseur has a lengthy history of back problems, the ALJ, based on the non-examining physician's and the consultative physician's assessment, placed no restrictions on Levasseur standing or sitting, which is contrary to Levasseur's subjective complaints. <u>See</u> Tr. 188. Also contrary to the consultative examining physician, the ALJ placed no restrictions on Levasseur's ability to walk. <u>See</u> Tr. 445. Furthermore, the ALJ placed no restrictions on Levasseur's ability to function in the workplace due to panic/anxiety attacks and possibly needing to miss work anywhere from daily to weekly due to these attacks.

"A vocational expert's testimony based upon an insufficient hypothetical question does not constitute substantial evidence to support a finding of no disability." <u>Chamberlain v. Shalala</u> 47 F.3d 1489, 1495 (8th Cir. 1995) (citing <u>Shelltrack v. Sullivan</u>, 938 F.2d 894, 898 (8th Cir.

1991).  This Court is persuaded that the ALJ did not accurately depict Levasseur's impairments in the first hypothetical question.  Although the hypothetical questions indicate that Levasseur has a history of a "panic disorder", the ALJ does not assess any limitations with the panic disorder or the frequency of these attacks.  Therefore, the first hypothetical question posed to the vocational expert does not constitute substantial evidence.

In the second hypothetical question posed to the VE, the VE indicated that there were no jobs in the national economy that Levasseur could perform with a standing and sitting limitation.  This Court is persuaded that the record is full of evidence that Levasseur's back problems limit his ability to stand and sit.  Furthermore, this Court is persuaded that Levasseur's panic disorder situation would also limit his ability to work on a consistent basis in the workplace.

The Commissioner did not carry the burden of establishing that Levasseur can perform jobs.  Levasseur did establish that he is disabled.

## VI. <u>CONCLUSION</u>

The Court has carefully considered the arguments of the parties and closely examined the record and is persuaded that

there is not substantial evidence in the record as a whole to support the conclusion made by the ALJ. This Court is persuaded that the ALJ erred in discrediting the testimony of Levasseur and his son because their testimony is consistent with the record. Furthermore, the ALJ's first hypothetical question did not accurately depict Levasseur's impairments and limitations.

The record clearly establishes that Levasseur is disabled. Remanding this case for further proceedings would only delay Levasseur's receipt of supplemental security income benefits (SSI), therefore, "an immediate order granting benefits without remand is appropriate." Cline v. Sullivan, 939 F.2d 560, 569 (8th Cir. 1991); Tennant v. Schweiker, 682 F.2d 707, 710 (8th Cir. 1982). Judgment shall be entered reversing the ALJ's decision of denying such benefits.

**Upon the foregoing,**

**IT IS HEREBY ORDERED** that the decision of the ALJ is reversed, and the Commissioner is directed to compute and award disability benefits to Levasseur with an onset date of February 12, 2003, which is the date that Dr. Van Balen performed his consultative exam of Levasseur and assessed Levasseur with restrictions that are consistent with the

record as a whole.  Tr. 443-45.

A timely application for attorney fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412 ("EAJA"), must be filed within thirty (30) days of the entry of final judgment in this action.  Thus, if this decision is not appealed, and Levasseur's attorney wishes to apply for EAJA fees, he must do so within thirty (30) days of the entry of the final judgment based on the Order in this case.

**IT IS SO ORDERED** this 9th day of November, 2006.

Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa